at all. Mr. Davis, whenever everyone gets settled, we'll start with you. Okay, we're ready. Good morning. It may please the court, Michael Davis, Benedict Cuny, and Douglas Beam here on behalf of Randall Greer. Christopher Greer was killed while home alone after law enforcement officers fired 13 rounds at his closed and closing door. One of the issues before the court is the correctness of the summary judgment order where there are genuine issues of how and why that happened. There are four principal disputes. First, where was the knife? Second, what was Christopher Greer doing at the time the police opened fire? Third, was the father-in-the-house claim an after-the-fact justification? And four, was the father-in-the-house claim, the claim that Christopher Greer's father was in the home, was that an after-the-fact justification? Well, the Exactly, Your Honor. That's not been addressed by the district court, the father-in-the-house claim? Yes and no. The court concluded, made a factual finding, that it was that they had a sincere belief that the elderly father was home. Obviously, as our record outlines. So once, where's the knife? What was Christopher Greer doing? What was Christopher doing? Father-in-the-house claim, and what was the full record? And did the police reasonably fear for their safety? And the resolution of whether there is a disputed fact falls within this court's analysis outlined in Williams v. Deal. Because Christopher Greer, the person most likely to rebut the police officer's claim of what happened, is dead and cannot testify. And under Williams, the court looks to the forensics evidence, the statements themselves, and all of the other evidence. I agree with you. The first and key issue is, what about the knife? Where is the knife? Yes, sir. At the time the first shots fired. So here's what I think the record tells me, and help me if I'm missing something. Okay, no knife was found in his hand at the time, right? Yes, your honor. The knife in the sheath is in his sheath. There's one still there. Securely encased. And Hayman or Canella says, that wasn't the knife I saw anyway. Exactly. Okay, so we know it's not the knife in the sheath he had. There's nothing in his hand, so it's got to be the broken knife in the coat. Respectfully no, your honor. The officers are actually shown a picture of that knife in deposition, and neither of them were able to say that was the knife. And when the court looks at... Okay, I know they can't identify as the knife, but that's in circumstantial evidence, that's the only potential knife that was found. I suppose in the evidence and the light most favorable to the officers, but on summary judgment, we look at the evidence and the light most favorable to the non-moving party. The officer, Officer Canella, who had the longest opportunity to see that knife, described it as a butcher knife. Officer Hayman... Large knife, did he say large knife or butcher knife? Butcher knife. Okay. Docket entry, it would be page... How long is the knife in the folds of the coat that's broken and blood on it? It was roughly, I believe, maybe 9 inches to 11 inches long, your honor. But it was not a butcher's knife. And I want to make sure to point out, the expert was actually asked if there was any evidence whatsoever as to whether Christopher Greer had a knife in his hand. And the expert was very clear that there was no evidence whatsoever as to whether Christopher Greer had a knife in his hand at the time he was shot. And the defense expert was unable to offer an answer as to whether Christopher Greer was holding a knife at the time. I don't know whether an expert can opine on whether somebody has a knife or not. But anyway, let's go to Holstein's testimony. Yes, your honor. Do you rely on that as well? Yes. About the knife? That also creates a genuine issue of material fact. And we know what he said, so I'm just trying to get the universe of knife evidence. And so I think I got your first part about the knife in the coat. While that doesn't help them, because the light must fail to you, they don't really say, that's the knife he had. Okay. In addition, your honor, the knife and the coat was actually wrapped in the coat. And, you know, that's another fact. It was actually wrapped in the coat. What are the knife evidence we've got? We got Holstein that says, I heard him yell knife. I was facing the outer garage door. I quickly turned. I could only see him from the waist up. And I did not see a knife. So you rely on that as well? Yes and no. There is a factual dispute as to what Holstein actually did. In his FDLE statement, Officer Holstein testified that he actually never turned his back. That, you know, as a good officer, he... You're saying there's a dispute there about where he was? Whether he made an about face, which is very significant. Right. Whether he was looking at the garage door, looking at the other two officers. Exactly. In the FDLE report, he testified that, sworn testimony, he testified... The district court kind of disregarded his testimony. And so you're saying his testimony about the knife, all of that. So have we got anything, whatever it is, we got Holstein, what he saw, or what he said in his position, the knife in the fold. Have we got any other universe of knife evidence? No, your honor. I think that's basically... Obviously the officer's credibility in general, right? Because the error in this case is that the district court made a credibility finding that the officers claimed that Christopher... Well, what you have to do, they say they saw a knife. And the question is whether there's evidence that challenges their credibility based on the things we've just talked about. Holstein saying, I didn't see a knife, he's right there. The knife is not in his hand, it's in the light most favorable to your clients. Yes, your honor. Really, if you get past the knife business, if there's a material, and I'm going to ask them this, issue of factors to the knife, really everything falls from that, doesn't it? Exactly. You don't have to worry about, you got to decide whether he had a knife in his hand or he didn't have a knife in his hand. I guess maybe you'd have to go to your number two, what he's doing, he's moving forward. Is he moving forward? Have we got any evidence? See, I think there's an issue of fact about that knife business. But then about moving forward, how do we contradict, how do you raise an issue of fact? Because I think we have to identify if there's issue of fact, what they are, that the jury would have to decide. How do you contradict their testimony, he was moving forward aggressively with the knife? Well, first we look at the specifics of what they're saying. Okay. According to Deputy Hayman, he testified that Christopher Greer was in the threshold of the door. We know what a threshold of the door is. That's, you close the door, that's where a person is standing. Okay. That is directly contradicted by the fact that the door was closing. A person cannot be in the threshold of a door while it's closing. If the officers fired at Christopher Greer while he was in the threshold of the door, then he could not have, it could not have happened that way. There's also the fact that... Where was the body found once he was shot? I know the door, the when the door was closed and Christopher Greer was actually behind the door, and according to the defense expert, they agree with us on this point, Christopher Greer would have been close to the door. All of the bullets that... Why couldn't he, even if he was in the threshold, be coming forward toward them, out the threshold? Well, if the door would have closed, it would have hit him in the back, right? If the door closes, it would have hit him in the back and pushed him on the outside. So, it's just physically, unless he's Casper the Ghost, obviously, it would have been... Does the record show which way the door, which direction the door opened and closed? Yes, Your Honor. It's a standard residential door that we all have. The way that you do it, you open, someone brings in the doorbell, you open the door, and you let them in. If you close the door, if you have a, you know, if you have a pet or a kid... The question is, does it open towards the garage or back into the house? Back into the house. And actually, if the court were to look at the brief of Brevard's sheriff, Wayne Ivey, he actually has a picture of that, that actually depicts how the door opened, so that really... So, your point is that even if the second scenario is more viable on summary judgment, then had he opened the door and been moving toward the officers, when he shot, the door would not have been closed. Exactly. Where his body is found. Because it's, because it's a backward opening door, not a forward opening door. Exactly, Your Honor. And that's one of the, that's the issue of fact that's there. The other issue of fact is the position of the knife. The deputies claimed that Christopher Greer had a knife in deposition. Cannella said that it was raised above his head. In the FDLE, he said it was near his head. Officer Holstein would have had an opportunity to see Chris approaching them with a knife in a downward motion as though he's going to stab, but he did not. So, it all blends together. If you find there's no knife, and then really all you have is Christopher closing the door. I want to make sure that I do address the... We don't have to find there's no knife, we just have to find there's a jury question. Exactly, Your Honor. And I do want to make sure I want to point out... I think we have that, if my colleagues don't have any other questions on the claims against the two officers, that's Heyman and Cannella, I want to shift you to the town and the sheriff. Okay, as I understand the claim against the sheriff is negligence of Exactly. The claim against the town is negligence of Holstein and Morris. Morris for not communicating, Holstein not communicating. That's basically it. Yes, Your Honor, and in this case... Okay, this seems to be a category two. They're there in response to a crime having been committed, called in. I don't know how you get to the town, and the district court seemed to have gotten that right. Can you help me on the relationship, not with Mr. Randall, Randall Greer, it's got to be a relationship with Christopher, but nobody's talked to Christopher. Morris hadn't talked to Christopher, Holstein hadn't talked to Christopher. If I can make it a bit easier, we alleged a number of theories in our complaint. The district court concluded that one of the promises of Deputy Officer Holstein to the Greers created a special duty, and that was the promise that he was going to direct Christopher Greer. So in terms of the duty, the district court did make some findings that were adverse to our position, but the court did conclude that there was at least one duty that arose from some of the promises. The district court, however, erred in concluding that one, the special duty had not been alleged, and two, the district court erred in concluding that causation, that there was no causation after making the factual finding that Christopher Greer attacked the police, and as we already have established, there's a factual dispute. And as the sheriff, the claim there is just negligent handling of their firearms. Yes, sir. It's a negligence claim under Respondent Superior. Exactly, Your Honor. They intentionally shot him, whether it was excessive force to do so or not, I don't understand how the sheriff stays in. Well, Florida common law recognizes a negligent use of firearm where there are facts that challenge the police's, you nobody says it was negligent. Well, there's the decisions before that, right? There's the decision to approach the home for, you know, the way they approach the home. That's not a firearm. Yes, Your Honor, that is part of the firearm claim. They approached with guns drawn for a person who did not attack them. Okay, you've answered my question, so I'll see if my colleagues want to ask you anything else. I actually did have one more on the credibility issue. We don't need to go into the the father-in-law after the fact justification in detail, but let's let's assume that you're arguing that the fact that they cited this father-in-law issue is isn't after the fact justification. Does that impeach their credibility on the knife issues as well? Exactly, Your Honor, and it's a very simple syllogy. As we explained in our brief, a reasonable juror could conclude that if the officer's testimony about what happened during the prior 13 minutes and 50 seconds had this after-the-fact justification, a jury could also conclude that the 10 seconds wasn't after-the-fact justification, and it actually explains why there is no knife. The reason why there is no butcher knife is because that too was an after-the-fact justification. As we explained in our brief, the father upstairs is mentioned 19 times in the police officer's statement, and it's actually joined by their sergeant. He had an elderly father there at the house until he just died a few months before, right? Yes, Your Honor, and there's really three there's three points to that. One, we have the officer Heyman's dash cam video records Holstein telling Heyman that the parents died recently. Two, we have the CAD which showed officer Holstein in his request for backup mentioning that Chris was home alone, and three, we just have the fact that the father was actually the town's longest longest-serving councilman, and a jury could really conclude that, you know, that the police had no credible reason for claiming that Christopher Greer's father was possibly upstairs. I do want to briefly touch upon, although I see my time has expired, I did want to address the abuse of discretion issues really quickly. The district... You've got a minute because we've taken you over your time and we I'll just take 30 seconds. I want to give them an opportunity to respond so that I can reply. There are several rulings that were an abuse of discretion. First, the striking of Mayor Cheney's testimony. It was only 30 days late. There's also the permitting Canella to file a motion for summary judgment 230 days after the deadline. That too was an abuse of discretion, and then also failing to rule on the reasonableness of the warrantless entry after all parties took discovery and briefed the issue fully before the court, and we'd ask the court to reverse and remand for a new trial. All right, thank you very much, Mr. Davis. Who's first? Mr. Bogan. Yes, Your Honor. Good afternoon. May it please the court. I'm Bruce Bogan. I represent Sergeant Hammond in this matter. So we're gonna... We've split up. I've taken eight minutes and then my colleagues will follow up as it relates to the respective... Mr. Jolly's got three minutes, Mr. Poulton's got two, and Mr. Netscher has two. Correct, and I, if I can go quickly, I may give them a minute or two off of mine, but... Sure. In any event, so the position with respect to the key issue in this case, with respect to Sergeant Hammond, of course, is the defense of qualified immunity. Our position is the district court absolutely was correct in determining that Sergeant Hammond was entitled to qualified immunity when he was, in essence, attacked, confronted by an armed individual, Mr. Greer, who possessed a knife, and it was objectively reasonable under those facts and circumstances for him to believe that his life was in serious threat of great injury or bodily harm, and therefore use of deadly force was authorized under the facts and circumstances which are not in dispute in this case, in our position. Well, I think the second part of your argument completely flows from the first, and I think you're right. If the premise is valid, then I think your clients do get qualified immunity. There may not even be a constitutional violation, but you think that there are no disputes of fact about whether or not the decedent was armed with a knife or where he was when he was shot? I mean, if the knife that's found is wrapped in a coat, how could that have happened? Well, if he's holding the knife in a posture, and then he shot through a door or through a wall, how does anybody have time to wrap the knife, the so-called second knife, in a coat? Well, clearly the knife is photographed, and you can see it at the scene, and it's in those pictures that are shown there, taken right next to the body. The knife is right there. Actually, that coat's down by his foot in the picture. It's not even up by his hand or his torso. I've got the picture here. It's down by his left foot, and he was right-handed because he had an injury, and both officers say he had it in the right hand. He's got a severe left-hand injury, correct? Correct, Your Honor. And so the knife, they say it's in the right hand, and the picture of the knife is to the victim. I mean, the knife and the coat is by his left foot. Correct, Your Honor. Those are facts. Those are there. The knife is there. That's the knife that had to have been used. I don't know what happened, but why didn't that alone make an issue of fact of whether he had a knife or not? It doesn't make an issue of fact because two officers saw him approaching with the knife in hand. They perceived the threat. It was objectively reasonable under those circumstances to believe they were in threat of a great bodily harm. That's what authorizes them to use deadly force under those circumstances. But doesn't one officer say he did not see a knife from a vantage point where he was looking at him from the waist up? Officer Holstein's testimony, I'm assuming you're referring to because clearly both my client and Officer Canella saw the knife. Canella yelled, knife. They immediately turned and saw the knife, saw him rapidly approaching with the knife in hand, and fired their weapons. Officer Holstein... What we know is that they say that they saw the knife. We don't know, we can't know that they saw the knife. That's where I think the credibility problem comes in. Well, the evidence in this case is that they saw a knife. That's what they objectively, that's what the objective evidence is in this case. That's what an officer, a reasonable officer would perceive if he sees a knife in someone's hand and he's approaching. They saw the knife. That's the testimony. Holstein's testimony doesn't create a dispute regarding whether there was a knife in the hand or not. Holstein has consistently, whether in his FDLE statement or whether in his sworn deposition statement, he has said he was never able to see his hands. He cannot testify whether or not there was a knife in hands if he can't see his hands. Well, and he can't see the hands below the waist or he can't see the hands at all because he says that he saw them from the torso up. He can't see the hands at all and remember. How is that possible? How is it possible? From his vantage point, yeah. Because, and if you look at his vantage point, it's also in the same photographs that Judge Hull was looking at. You can see the narrow window of opportunity he would have had to have looked through and the picture speaks a thousand words in this case. He had, before the shots were fired, he had turned and had been going to the front door. Again, he had his own firearm. He was going to protect the front door to see if the individual was coming out the front when he heard Canelo yell knife. Within seconds of the yelling of knife, that's when he heard the shots fired and when that split second occurs, that's when he looked back and he had this narrow view for a split second before shots were fired and it was over. It How do you explain the position of the body in relation to the door? The position of the body, obviously, as we know, the door was open according to the experts when the first round was fired. Open full or open jar? Well, it was either partially open or open to some degree because one round went through, you know, without striking the door. The second round, according to the expert, on an angle as the door is closing and the remaining rounds... So he couldn't have been in the threshold? Well, he obviously... How do you define threshold? Are you talking about that little strip? You define it for me. I'm not trying to define it. If you're talking about the strip where the door closes... If he's at the threshold, to me, generically speaking, he has opened the door to a sufficient degree where he can step to the opening of the doorframe. Maybe not fully, but partially, right? If not, he's still behind the door. Well, again, we're talking about the semantics. I mean, you know, you can be right in front of a door. You can be right standing on top of where the door would close itself. I don't know if it was ever actually... I'm sorry. I don't know if it was ever actually defined within that precise distance as to where... How could the door have been closed? Well, obviously, his body pushed it after it was shot. It had to push it forward because... Has he's falling backwards from the shot? I don't know that. I mean, I don't think it makes any difference as it relates to whether it was objectively reasonable for them to fear when a person's coming at them with a knife. That's the issue. You keep saying with a knife and we're all grappling. None of us have any answers yet, I don't think. We're all grappling with whether or not the evidence at summary judgment shows that they saw a knife. I mean, if he was coming at them with a knife, I don't think any of us would dispute that the officers have the authority to use deadly force. The question is, at summary judgment, are there disputed facts about whether or not he had a knife and where he was when he was shot? And I'm trying to figure out the second question. Where was he when he was shot? Because if he was behind the door and you're telling me that Officer Holstein couldn't get a good view, then no one can see the knife. Well, the officers that saw the knife, there are only two officers that saw the knife because they saw him. Canelo screamed knife because he was coming forward, attacking them. They saw the individual with a knife, they were in fear of their lives, and that's when they began to fire. So that's the sequence of events. And that's exactly what the evidence in this case is that the district court considered because there is no dispute that those two officers who fired saw the knife. Would your position be different if Officer Canelo said that he saw a knife and Officer Hammond said I did not see it? If Officer Hammond said that he never saw a knife, but Officer Canelo, well, I mean, obviously my client is... I know that's not this case, but I'm saying if, let's say, Officer A saw a knife and Officer B in this situation said he didn't see a knife, would your position still be that it's indisputable that the officer saw a knife? If they both had the exact same position, just like in this case, Officer Holstein did not have the same view that both Hammond and Canelo had, that is very obvious. Right, but in this hypo, the officers are in the same position that they were in this case, and Officer A says I saw a knife and Officer B says I didn't see a knife. If two officers were standing exactly the same, that their vision was exactly the same, clearly, then if one didn't see it... Hypothetical. Hypothetical. If one says there was no knife, A, Hammond says no knife, B, Canelo says there is a knife, what's the answer? It's a question of fact, right? Again, depending if they have the exact same circumstances. That's what the hypothetical assumes. That's what the hypothetical assumes. They had equal view. They're trying to paint you into a corner from which there's no escape. Officer Holstein says there was no knife, that's the problem. The only logical answer is, as my colleagues have framed the question to you, is that that has to be an issue of fact. If the two officers have the exact same... They're standing shoulder to shoulder. And they both can say we were looking at the exact same person at the exact same time, clearly, then that's a dispute, but that's not this case. It is absolutely not this case. Both of those officers saw that knife, and there's only one officer who couldn't see, and he's in the back of the garage, 15 feet away, and he's looking the other way. And that's exactly what the district court said. Okay, before you sit down, this is all my time, not taking away from the others, and Mr. Davis can think about it, because I can figure another thing out. So this is the picture of the knife. The frost cutlery knife, they refer to that. Now, and that's the knife that was in the fold? Yes, and it has blood all over it. Yes, right. And what you see in one of the pictures, I mean, you see this first part here. I mean, the pictures line up, and it does look like, and by the way, this is 15 inches. This looks like a 24-inch big-time knife, like butcher knife. But anyway, they said it wasn't that big, but they've got a scale on it. But that's not my question. Here's my question, which is so weird, and I hadn't been able to figure it out. And so when you look at the fold where, I assume, somebody said that's where we found the knife. It's not moved. Is that correct? Somebody found the knife, yes. Yeah, I mean, this must be how, after the shooting, this is where the knife is in the fold, right? Correct. Okay, but look what's weird about it, and that is the end of the knife is sticking into the fold. Do you see? And then the other thing I couldn't figure out, and I don't know where, this is the other part of the knife, so I'm not really worried about the other part of the knife, but this is sticking into the fold. But there's no way you can line up the dark and the light with the dark and the light here, because here, the dark on this one has got all of these jagged edges. Did anybody look at that and realize that whatever this picture is, maybe it's just how it took it? Has anybody talked about that? Have y'all talked about that? I don't believe so, Your Honor. Maybe Mr. Poulton can answer that question when he gets up here. But this is a light picture and dark here, and here on the jagged edge is dark and the other part's white, and I just... Yeah, I don't know the answer. I think Mr. Poulton might have an opinion about that. His office did all the forensics, and so... You've answered my question. You don't know. Okay, and obviously, I've used all my time. Okay, thank you very much. Mr. Jolly. If it pleases the Court, I'm Bruce Jolly. I represent Deputy Cannella, who's the defendant in this case. Obviously, as you know, as the discussion has already indicated, this is an appeal of the granting of a summary judgment in favor of all of the defendants. I would suggest, though I think the brief suggests, that the review of the record demonstrates the summary judgment on behalf of Kamen and Cannella was appropriate, should be affirmed. You've asked a number of questions of Mr. Bogan, and Cannella's basic contention as it relates to the use of force is the same as Haman's. Their relative positions, factually, during the incident itself... So if we believe that the summary judgment record, viewed in the evidence most favorable to Mr. Greer, shows that the officers saw the decedent with a knife, then your clients prevail, right? Yes. If the record shows differently, what happens? I don't... Well, if the record shows that there are material disputes in the facts... Well, there's a... Whether or not he had a knife is material, right? There's no doubt that's material. It's disputed. I've always taken the position Cannella's at the door. Cannella looks in and he says, Knife! Does it make sense, at least from our perspective? Would it have made sense for him to make that up as the event... It's not a make-up thing. It's that given human frailty, human beings sometimes make mistakes. And that's at least one of the theories advanced by the defense, that he said knife and there was no knife. We got to figure out whether or not that's correct or not, but that's at least part of the argument. I understand. I have always taken the position that Cannella saw the knife. The decedent, Mr. Greer, had a knife. I've always thought that it would be unusual, I think ridiculous, for an individual to yell knife when, in fact, he didn't have a knife. If that was the case... Where is the knife then? You don't contend it's the one enclosed in the sheath, do you? Actually, I do. You do? Yep. Yes. Yes, Your Honor. Okay. So you don't think it's the one in the folds? You think it was in the sheath and he got shot? Oh, no. I misunderstood. No, it's the one in the folds, not the one in the sheath. It's not the one on his waist? No, Your Honor. Okay. So it is the one in the folds? That's been the position that the defense has taken. All right. And then how does it get down by his left leg when he's shot? It's not up by his hands. No, it is not. That's true. It's nowhere near his hands, nowhere near his torso. He was right-handed, right? Everybody agrees he's right-handed. He has problems with the left hand. And your client said it was in his right hand. Yes. So how does the knife, if he had it, get down by the folds? This incident unfolded unbelievably quickly. As he approached the deputies, as the deputies had begun to enter the house, backed up as he approached them with the knife, they began to discharge their firearms as they're backing up. The door is closing. First shot goes, misses the door. The next 11, I think it was, hit the door in varying places. My recollection is, I don't remember seeing this in the brief, but my recollection is that as the door was moved, the jacket was moved also. It was at his feet. And that is the explanation if there is one, or how that knife ended up where it was. Remember the door, the door first closed, and then it was open again when the deputies entered. How do you explain the door closing issue? That's actually something that I think we've all been a little bit concerned about. How, given the fact that he was at the threshold, according to their statements, and it was an interior, the door would open in the direction of the interior, how did it close after he was shot? He closed it. After he was shot? As he was, as this event was unfolding. The deputies, the door opens, the deputies see him, knife, begin to retreat, and then he comes forward, the first shot is discharged, and then he literally goes up against the door and the door closes. Who testified, who testified as to that? One of your experts? No, I think the guy said that. That's what happened. Who said that? The deputies, sorry. Said that he closed the door. They did not close it. Why? Okay, but there's a difference between him not closing it and the deputies seeing him close it. You think there's testimony in the record that somebody saw the decedent close the door? I'm reluctant to say that, no sir. I will not say that. But the door closed, we've always, yes, speculated from the weight of his body as he was coming forward. As he was getting shot? Yeah, I think so. Yes, your honor. So he was going forward as he's getting shot instead of going backwards? That's my understanding. He was coming forward and the door closed as they're cranking off these rounds. Well, wasn't he obviously trying to close the door himself? He had to have closed the door. Well, I'm reluctant to say that. Right before this, he was holding the door closed and they couldn't get in. I mean, he was trying to keep them out. So why wouldn't it be reasonable, in terms of the most plausible scenario, that he's trying to close the door, not that he's aggressively coming toward them? I wouldn't exclude one as opposed to the other. I think he was going forward, but clearly he did not want them. Okay, the knife is clearly broken after it's all over. Okay, so did he break the knife before he waved it at the deputies? We think—I don't know the answer to that question. How did the—all right, the knife didn't get broken after the first shot. Do you agree with that? No, I don't think it got broken after the first shot. Okay, so the knife is broken before the first shot. We think the knife was broken sometime earlier when he was stabbing at the door. Okay, so at most, then, he's got only part of the knife. I don't want to say at most. Certainly, that's a plausible explanation. Now, there was one— You've got— Those are all the—I'm sorry. We've taken you way over your time, so if you want to devote 30 seconds to something, you can do that. 30 seconds I would devote is to the issue that the judge abused his discretion in allowing the motion for summary judgment to be filed untimely as to the state tort claims, which were not addressed in the original motion. It was within his discretion to do that. It was allowed since he'd already made determinations of fact, which affected those claims against the defendant, Cannella. And as the order recites, it was in the best interest of resolution of the case as well as judicial account. So it was not an abuse of discretion. All right, thank you very much, Mr. Jollison. Yes, sir. Mr. Poulton. Good morning, Your Honors. Tom Poulton here on behalf of Sheriff Ivey. I want to just kind of pick some of the questions that have come up that relate to the placement of where everything was found. And beginning, Judge Hull, with your question about why the knife appears differently. First, as you pointed out, it was broken. It was found in a broken condition. When you see it in the lab, they've put it back together again. And second, yes, it's a lighting issue. Sometimes you see that it depends on the angle that they're taking the picture when it's in the folds of the jacket. Which, by the way, the crime scene investigator, I can't recall his name right now, but it's in the record. The crime scene investigator said finding it in the folds was consistent with the fact that they opened the door back up when the shooting had stopped. To answer the bigger questions, I want to- Do you agree the knife was broken before the shooting started? We don't know whether it happened during or- Because there's a gouge on the inside of the door that was not there earlier that day. There's a gouge on the inside of the door. I thought that was when he was trying to keep the officers out to begin with. Certainly possible. But if he's still coming at them with a broken knife, I don't know that that's- Because I'm not so sure the knife he had is the knife in the folds  of the jacket. Well, presumably it would be the larger piece, not the blade. And let me back up about 10 seconds in the scenario because I think that this helps. One point is we keep talking about the decedent shutting the door. The deputies don't know that. One of the deputies kicked the door open because the way this happened was when they first went in there, Christopher Greer had braced his body against the door. They saw his shadow underneath. The reason that Holstein had backed up and was now paying attention to the front door was because the shadow went away and they thought that he was going back to the front door. And Heyman kicked the door open. And they don't know whether it's because it was rebounding shut or because Mr. Greer had reached and was pushing it shut. But when you talk about the placement of the jacket, you have to remember they had to open the door back up again. And that's why it's found in the folds. Counsel referred to it as being wrapped in the jacket. That's not accurate. It was found in the folds. You're saying that the action of the door is what pushed the folds of the jacket together and somewhat obscured the knife? Right. In fact, when the deputies went in, they didn't even see it. They saw the one in the sheath and Heyman went and took it out of the sheath and put it on the counter. It wasn't until the crime scene techs got there and started photographing the scene they realized there was the second broken knife in the folds of the jacket. The issue of what Holstein saw, I just want to emphasize that the points have been made that his attention is now being redirected back to the front door of the house. He hears Knife turns his attention back and says, it all happens in a split second. He says, I'm looking over Heyman and Canella's shoulders. And he says, I can't see his hands. So when you talk about I can't see above his torso, he's saying I can't see his hands. So how can Holstein say he saw a knife if he can't see his hands? I mean, the whole thing about what Holstein could see or couldn't see is irrelevant to Heyman and Canella, given their positions. The hypothetical, you ask, about what if they're standing right next to each other and they see the same exact thing. Yes, but they're not in those positions. And if you take a look closely at what Holstein says, and most importantly, put everything he says in context, and you look at the pictures, it makes sense about that sequence of events and why it is that Holstein would not have seen what Heyman and Canella saw. But just to be clear, didn't Holstein say that he could see him from the waist up? Yes, but he couldn't see his hands. So could he have a knife above his head? Well, in that hypothetical, though, you're assuming that he's coming straight flush on from the door. No, I'm no longer in the hypothetical. I'm in the actual circumstances. Don't worry. But if one officer, if Holstein is testifying that he saw from the waist above and did not see his hands, doesn't that mean that according to that officer, his hands weren't up here? Except that he's saying my view is blocked by Heyman and Canella. It's not a clear on picture. He doesn't say that in both statements. Actually, I think he was statement, if I'm not mistaken, he's statementized twice. And then there's also a deposition. He gives an FDLE statement, does he not? Yes. And in that one, he doesn't say that his view was blocked, right? I would honestly, I'd have to go back and look. I can't say right now off the top of my head as between them. Anyway, but it doesn't I mean, he didn't fire. So I don't know what his incentive would be, you know, to say differently. OK, Mr. Bolton, thank you very much. We appreciate it. Thank you. OK, Mr. Natcher, you get to close out the side. Yes, Your Honor. Eric Natcher on behalf of the town of Indian Atlantic. And I'm happy to move the court away from the knife because the claim against the town fails at every step of the analysis. And Judge Mendoza's order, I think, is thorough and should be affirmed in every respect. Judge Hull, you're correct. This this activity is clearly falls under Category two of the Trianon taxonomy. This is classic law enforcement activity, responding to a scene where a violent felony was committed. There has never been a common law duty owed under those circumstances. And Judge Mendoza got it absolutely right in that respect. With respect to the special duty, it's important to note, again, it was never pled in the in the 30 minute complaint that the town or that Officer Holstein or Chief Morris owed a special duty to Christopher Greer. The specific claim is for an alleged breach of a duty to the general public that's alleged in the complaint at paragraph 245 to communicate with law enforcement in a reasonable, safe, prudent, and non-negligent manner. So it's not alleged. And even under the circumstances, as Judge Hull pointed out, to establish a special relationship, that would have to be some sort of reliance interest that's created by some statement given by either Officer Holstein or Chief Morris to Christopher Greer, not to Randall Greer. So there can be no reliance under those circumstances. And in any event, what they're relying on, if you go back and look at the brief, is the the shooting where Chief Morris specifically says, we will not Baker Act your brother unless he's a threat. And then it generally advises if there's an immediate threat, call the police. That's advice that any prudent police chief would give to any member of the public. So we think that the summary judgment order with respect to the town should be affirmed. And again, whether or not there was a knife has nothing to do with that. It's a Category 2 activity. There's no common law duty. No special duty alleged. And under the record evidence, no special duty exists. So we'd ask that the court affirm summary judgment in favor of the town. All right. Thank you very much, Mr. Hatcher. Mr. Davis. May it please the court. If I can just I want to start with the town's argument that special duty was not alleged under Rule 8D2. It expressly allows a party to provide alternative theories. The core of the town's argument is that since we allege general duty, the rest of the complaint that sets out the facts establishing a special duty were insufficient. And that's just not the case. And I want to make sure that I outline the specific portions of the complaint, the Third Amendment complaint that set out the underlying facts that gave rise to special duty. In paragraphs 247 and 249 of the complaint, the promise by Chief Morris to Baker Act, Christopher Greer, is alleged. In paragraph 35, Officer Holstein's promise to the Greers to only Baker Act, Christopher Greer, is alleged. In paragraphs 247 through 248. In your claim against the town, the plaintiff is the representative of the estate, correct? Yes, Your Honor. Okay. So the duty's got to be to the plaintiff. You agree to that? That's Christopher. I'm not necessarily in a position. Wait a minute. The plaintiff is not Randall. The plaintiff against the town is Christopher, correct? Or his estate? Yes, Your Honor. Christopher Greer. I'm sorry. Randall Greer. Is there any allegation? And you're right, your complaint is very good. It incorporates all the 200 facts or whatever it is into each allegation. I promise you. We know that. Okay. So you get all those facts. But how is there a duty, special duty, to Christopher here, who's the plaintiff in this case against the town? Well, if I can respectfully avoid that question. One, you know, that was not addressed by the district court below. And honestly, I've not necessarily researched that for this case. The district court concluded that at least there was a duty. And so the district court didn't address that issue. But secondly, I will note that if the court looks at paragraphs 247. The district court says you didn't plead the special duty. Exactly. But in terms of the specific question of whether the duty had to be to Christopher Greer or Randall Greer, the court did not address that. The court actually concluded that there was at least enough evidence for a finding that there was a special duty owed by the promise. But paragraph 248 of the complaint and 247 do allege that Officer Holstein and Chief Morris breached their duties of care that were owed to Christopher Greer. The complaint does at least allege that a duty was breached. And I agree with that. And the question is, where did they have any communication to Christopher Greer? There was no communication with Greer at all. I think paragraph 252 puts it together. In paragraph 252, we allege that they owed a duty to Christopher Greer to apprehend him reasonably. So that is there in the complaint as well. Can I ask you about this knife business again? This is the part of the knife. It's exhibit 188-5. Is that where the other part of the knife was found? No, we have the picture of the knife in the folds. That's 188-something. But that other part of the knife, is that where the other part was found? Because there's not any folds. It's just on top of the jacket. Is that correct? Your Honor, that's a very good question. Unfortunately, I do not know the answer off the top of my head. I can't submit a letter. I want to make sure that I do address the Maricini issue that we did raise. Neither side has disputed that. Maricini's testimony at trial will be very critical. Maricini testifies that with respect to the location of Christopher Greer's arms. His testimony is that Christopher Greer's arms could have only been down. That's very critical, as the court has seen, to the resolution of what actually happened. Maricini also testified that the first bullet went through the door and struck Christopher Greer. Obviously, that's very important to the resolution of what actually happened in this case. Finally, with respect to the- I thought there was one bullet that didn't go through the door, but the remaining 12 did. Yes, Your Honor. It's Maricini's testimony that it could have just been a missed shot, that they just missed. But did the first bullet go through the door? No, Your Honor. Yes, it did not go through the door. Okay, okay. The first bullet went in the hole, I mean, where the door was ajar. But by then, the door was shut. Well, let me back up, because I don't want to concede the point. Under our version, if Maricini is allowed to testify, his testimony will be that the first bullet went through the door and struck Christopher Greer. Their version of the evidence is that the first bullet missed the door, and then, you know, the other ones followed. Was there a bullet found inside the house that had not gone through the door? Yes, Your Honor. So, yeah, we agree that there's a bullet that did not go through the door. It actually passed through and ended up in the backyard somewhere. Okay, Mr. Davis, thank you very much. Thank you, Your Honor. We're in recess until tomorrow morning. Thank you.